```
 1                UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3   UNITED STATES OF AMERICA,     :
     Plaintiff,                    :
 4                                 : Case Number:
     vs.                           : SA:17-CR-00608
 5                                 : San Antonio, Texas
     JAMES AMOS HEADLEY,           : July 19, 2017
 6   Defendant.                    :
     ********************************************************

 7

         TRANSCRIPT OF PRELIMINARY/DETENTION HEARING
 8        BEFORE THE HONORABLE ELIZABETH S. CHESTNEY
                UNITED STATES MAGISTRATE JUDGE
 9

     APPEARANCES:
10   FOR THE PLAINTIFF:
       Erica Giese, Esq.
11     Assistant U.S. Attorney
       601 NW Loop 410, Suite 600
12     San Antonio, Texas  78206
       (210)384-7152
13

14   FOR THE DEFENDANT:
       Molly Lizbeth Roth, Esq.
15     Federal Public Defender's Office
       727 East Cesar E. Chavez Blvd.
16     Room B-207
       San Antonio, Texas  78206
17     (210)472-6700

18

     COURT RECORDER:  FTR GOLD
19
     TRANSCRIBER:
20     Angela M. Hailey, CSR, CRR, RPR
       Official Court Reporter, U.S.D.C.
21     655 East Cesar E. Chavez Blvd., Third Floor
       San Antonio, Texas  78206
22     Phone(210)244-5048
       angela_hailey@txwd.uscourts.gov
23

24
     Proceedings reported by electronic sound recording,
25   transcript produced by computer-aided transcription.
```

```
1                        I N D E X

2                     Direct      Cross     Redirect    Recross
    WITNESS FOR
3   PLAINTIFF:
    Agent Rhonda Clark        4          14
4

5
    WITNESS FOR
6   DEFENDANT:
    Pamela Headley            17         21
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    (10:04 a.m.)
 2           COURT SECURITY OFFICER:  All rise.
 3           THE COURT:  You may be seated.
 4           DEPUTY CLERK:  Court calls the case of United
 5    States of America versus James Amos Headley, case
 6    SA:17-M-796.
 7           MS. GIESE:  Erica Giese on behalf of the United
 8    States.
 9           MS. ROTH:  Molly Roth for Mr. Headley.  We're
10    ready, Your Honor.
11           THE COURT:  Good morning, everyone.  We're here
12    today on the preliminary rightness of the hearing,
13    correct?
14           MS. GIESE:  Yes, Your Honor.
15           THE COURT:  Mr. Headley, the purpose of a
16    preliminary hearing is to determine whether or not
17    there's probable cause to believe the offense that you
18    have been charged with is one that you committed.  So
19    we're going to proceed now and the government will
20    start by presenting its evidence.
21           MS. GIESE:  Yes, Your Honor, thank you.  The
22    government calls Agent Rhonda Clark.
23           DEPUTY CLERK:  Do you swear or affirm that the
24    testimony which you may give in the case now before the
25    court is the truth, the whole truth and nothing but the
```

1           truth?

2                 THE WITNESS:  I do.

3                           EXAMINATION

4    BY MS. GIESE:

5    Q.    Will you state your name for the record please?

6    A.    Rhonda Clark.

7    Q.    Where do you work?

8    A.    The Federal Bureau of Investigation.

9    Q.    Are you familiar with an individual named James Amos

10   Headley?

11   A.    I am.

12   Q.    And how are you familiar with him?

13   A.    Last week, Thursday I believe, there was talk about a

14   voice message that had been left on Senator Ted Cruz's voice

15   mail box back in Washington, D.C. and the phone number that

16   was on the voice mail was matched to the name of James

17   Headley and from there we were able to determine his home

18   and his place of residence.

19   Q.    And so who reported to the FBI that this call had been

20   made?

21   A.    The U.S. Capitol Police.

22   Q.    And was the call -- did they identify the call as being

23   made to the Capitol?

24   A.    They identified the call as being made to -- yes, the

25   Senator Ted Cruz's office in Washington, D.C.

1    Q.   In one of the Capitol Complex buildings?

2    A.   Yes.

3    Q.   Do you know how they identified that the number was a

4    210 number, was it Caller ID?

5    A.   Caller ID.

6    Q.   And did Capitol Police then notify FBI of the lead or

7    send the lead to the San Antonio Division?

8    A.   Yes.  Capitol Police took that number, they knew it was

9    a San Antonio number.  They actualy were the ones that ran

10   that number through the database and found Mr. Headley's

11   name.

12   Q.   And was that number identified as -- I won't say the

13   whole thing, but (210)889 and then the next number is a

14   five?

15   A.   Yes.

16   Q.   And so once FBI here in San Antonio received the lead,

17   what did an agent do?

18   A.   They took the phone number and the name and ran it

19   through a database to find the address, gathered other TFO

20   and agents and some uniformed officers and went over to the

21   house because -- to identify, you know, who was living there

22   and the agents knocked on the door, the voice of Mr. Headley

23   sounded similar to the voice mail.

24   Q.   Let's backtrack a little bit.  So when agents here

25   pulled up the information tied to that 210 number, did they

1  link that number to a house located in Universal City?

2  A.    Yes.

3  Q.    And is that here in the Western District of Texas?

4  A.    Yes.

5  Q.    And did the Capitol Police when they received the

6  information on the number, a threatening message was left

7  that was connected to this phone number, correct?

8  A.    Yes.

9  Q.    And was Capitol Police able to send a copy of the voice

10 mail via e-mail to the agent here in San Antonio?

11 A.    Yes.

12 Q.    Okay.  And was the agent here in San Antonio able to

13 listen to the call?

14 A.    Yes.

15 Q.    About how long was the call?

16 A.    I'd say about maybe a minute and a half.

17 Q.    And to be sure, the caller did not identify himself,

18 correct?

19 A.    No.

20 Q.    And you've listened to this voice mail?

21 A.    Yes.

22 Q.    Was the caller a male or female?

23 A.    Male.

24 Q.    And did the caller have a distinctive voice?

25 A.    Yes.

Q.    And so once the number was linked to the Universal City

address, just going forward with what you were saying,

agents and Task Force Officers went to that address,

correct?

A.    Yes.

Q.    Did they confirm prior to going to that address that

the person or persons living at the address had the last

name Heedley(ph) or Headley?

A.    Yes.

Q.    But at that point they didn't know that a Mr. Headley

had made that call, correct?

A.    Correct.

Q.    Before the agent who heard the -- who took the call

from Capitol Police, did he listen, do you know, to the

voice mail multiple times?

A.    Yes.

Q.    So once the agents went out to the Universal City

address linked to Mr. and Mrs. Headley, what did they do?

A.    The interviewing agent went to the door with a

uniformed officer and the plan was to see who answered the

door and listen to the voice and at that point make a

determination whether or not to move forward.  The

interviewing agent at that point made the determination that

the voice of Mr. Headley sounded familiar -- sounded similar

to the voice mail that was left on the Senator's voice mail

1    box.  And other agents approached at this time, another

2    agent actually called the cell phone and they could hear it

3    ringing inside the residence.  Mr. Headley allowed agents or

4    gave consent for a protective sweep and agents went in,

5    called the phone number again and heard the phone ringing

6    again inside the house.

7    Q.   And they called the same number that appeared at the

8    Capitol Complex phone, the 210 number?

9    A.   Correct.

10   Q.   Can you tell us, having heard the voice mail, just

11   generally part of the voice mail an excerpt is included in

12   the complaint, but can you tell us generally summarize the

13   whole call?

14   A.   He basically threatens the Senator, he threatens his

15   family, threatens to shoot the Senator in front of his

16   family.

17   Q.   Does he sound angry when he's saying this?

18   A.   Yes.

19   Q.   And does he indicate in the call that the threat is

20   based on something potentially that happened that day or

21   something involving policy or politics in some way?

22   A.   Specifically in the call I don't recall that being

23   mentioned on the voice mail.

24   Q.   Do you remember him at the beginning mentioning

25   something regarding President Trump?

1    A.    I don't.

2    Q.    In the call, though, he threatens to kill Senator

3    Cruz's children or family in front of him before then

4    killing Senator Cruz, is that correct?

5    A.    Yes.

6    Q.    And so once the agents were able to identify that the

7    (210)889 number was, in fact, located inside Mr. Headley's

8    or Heedley's residence and that the voice sounded familiar,

9    did they then interview Mr. Headley?

10   A.    Yes.

11   Q.    What happened?

12   A.    Well, so the interview actually took place back at the

13   office.  They brought him back to the FBI office and

14   Mr. Headley did confirm that he had made those calls.  He

15   also told the interviewing agent that he had made some more

16   calls to Senator McCain's office and to the office of Bernie

17   Sanders, but not specifically Bernie Sanders, somebody who

18   worked for him.

19   Q.    And when he, Mr. Headley, said to agents that he had

20   made a similar call to Senator McCain's office, did he

21   elaborate what "similar" meant?

22   A.    I do not know.

23   Q.    Did you then reach out or someone reach out to Capitol

24   Police to corroborate that that indeed had happened with

25   Senator McCain's office?

1  A.   One of the agents did reach out to Capitol Police and

2  they did corroborate that the phone call had been placed.

3  Q.   Did Mr. Headley give consent to agents to search his

4  phone?

5  A.   Yes.

6  Q.   And did the agents find that there were calls made from

7  that cell phone, the (210)889-5 number to either Senator

8  Cruz's office or the Capitol, U.S. Capitol exchange number?

9  A.   They found that phone numbers had been placed to a D.C.

10  area code.

11  Q.   And that's area code 202, correct?

12  A.   Correct.

13  Q.   And to be sure, prior to speaking to Mr. Headley, he

14  was read his Miranda warnings and agreed to speak to agents

15  at that time, correct?

16  A.   Correct.

17  Q.   Once he was identified and in custody, did someone run

18  his criminal history?

19  A.   Yes.

20  Q.   And can you tell us about what you found?

21  A.   There were a few possession charges of marijuana and

22  then unlawful carry.

23  Q.   Was there perhaps not an arrest, but a 911 emergency

24  call made to Universal City Police in 2008?

25  A.   There was.

1   Q.   And what did you learn happened?

2   A.   The police report stated that Mr. Headley's wife had

3   contacted the Department to let them know that two days

4   prior her and her husband had gotten into some sort of

5   argument and he walked out of the room, grabbed a rifle,

6   came back out, sat on the couch.

7   Q.   And she reported this two days later, correct?

8   A.   Correct.

9   Q.   And to be sure, he was not arrested for that offense?

10  A.   He was not.

11  Q.   And he was never convicted of it?

12  A.   No.

13  Q.   But he was at the time at least in 2008 in possession

14  of a rifle?

15  A.   Correct.

16  Q.   Okay.  And I failed to ask you, on the date agents were

17  at his home and conducted a protective sweep, they didn't

18  find any weapons during the sweep, correct?

19  A.   They did not.

20  Q.   Did they ask Mr. Headley whether he owned weapons?

21  A.   Yes.

22  Q.   And what was his response?

23  A.   He said he owned a Beretta handgun.

24  Q.   And to be sure, they did not seize that handgun,

25  correct?

1    A.    No.

2    Q.    He's not a previously convicted felon?

3    A.    No.

4    Q.    And he has the right to possess that weapon, is that

5    right?

6    A.    Yes.

7    Q.    While you were -- while you had Mr. Headley in custody

8    either when you were taking him back to the FBI office or to

9    Geo, did he begin talking to you and another agent without

10   having been questioned?

11   A.    He did.

12   Q.    Do you remember what he told you?

13   A.    He was talking about his prior work experience.  He

14   told us about his time in the military.  And there was one

15   particular incident he talked about while he was in the

16   military, you know, teaching somebody a lesson and beating

17   them.

18   Q.    Physically beating them?

19   A.    That is what it appeared happened.

20   Q.    And what was his -- what's your opinion as to his

21   attitude at the time he was telling you this story?

22   A.    I was a little shocked that he would choose to tell a

23   story like that on the way to Geo.  It was just kind of --

24   there wasn't really any emotion necessarily attached to it,

25   he was just telling a story.

```
1    Q.    Okay.   And do you know when the agents spoke to

2    Mr. Headley either at his home or at the FBI office, did he

3    talk about some anger issues or outbursts that he has, did

4    he admit to them?

5    A.    At the FBI office?

6    Q.    Wherever it was that he admitted to that.

7    A.    I know that at the initial appearance he had talked

8    about having issues controlling his emotions.

9    Q.    Okay.   Did he talk to agents at some point about having

10   had a stroke in -- I can't recall the date, but he had a

11   stroke somewhat recently, correct?

12   A.    Yes, I believe it was about three years ago.

13   Q.    And are you aware that either Mr. Headley or his wife

14   have said that he's had some problems controlling his anger

15   since he had the stroke, correct?

16   A.    Yes.

17   Q.    Based on FBI's conversations with Capitol Police and in

18   turn their discussions with Senator Cruz and his staff, is

19   it your understanding that Senator Cruz was worried about

20   his safety at the time?

21   A.    Yes.

22   Q.    And in fact, he was due to return to Texas that

23   weekend, correct, this weekend?

24   A.    Correct.

25   Q.    Did he, in fact, return to Texas?
```

```
1   A.    I have no idea.
2             MS. GIESE:  I'll pass the witness, Your Honor.
3                      EXAMINATION
4   BY MS. ROTH:
5   Q.    Agent, did you have a chance to confirm Mr. Headley's
6   military record?
7   A.    I did not.
8   Q.    Other agents confirmed that?
9   A.    No.
10  Q.    Looked into the good conduct medal that he had?
11  A.    No.
12  Q.    Have you tried yet to obtain any medical records
13  regarding Mr. Headley?
14  A.    I have not.
15  Q.    The story that you related on direct was that about
16  Mr. Headley's own transporting of a prisoner in prior years,
17  is that the one you're referring to, you talked about a
18  story that --
19  A.    It was a story that he was talking about from his
20  military career, I don't know if he was transporting a
21  prisoner.
22  Q.    So you don't remember the details of the story?
23  A.    No.
24  Q.    What year did that story supposedly happen?
25  A.    While he was serving in the military.
```

```
 1   Q.    When?
 2   A.    I did not pull his military records, so I don't know.
 3   Q.    So you didn't -- you don't have any corroboration of
 4   that story --
 5   A.    No.
 6   Q.    -- that you're talking about.
 7         You mentioned some of that criminal history.  You've
 8   had a chance to look at the Pretrial Services Report in this
 9   case?
10   A.    Briefly.
11   Q.    Are you disputing it then, its accuracy?
12   A.    Disputing it?
13   Q.    Yeah, your testimony is a little different, I just want
14   to make sure.  The Pretrial Services Report lists one 1991
15   unlawful carrying a weapon arrest that was dismissed on a
16   deferred adjudication and then a 1994 possession of
17   marijuana charge for which Mr. Headley was sentenced to one
18   year probation?
19   A.    Okay.
20   Q.    Your testimony was that there were -- there was more
21   than one possession of marijuana charge?
22   A.    I must have misspoke.  I saw several listed on the NCIC
23   report.
24   Q.    Okay.  Like -- you understand that NCIC reports
25   sometimes repeat things, list things in multiple places?
```

1    A.    I do.

2    Q.    So do you dispute this summary of criminal history that

3    I've just given you and read you from the --

4    A.    No.

5    Q.    -- Pretrial Services Report?   That's accurate?

6    A.    Yes.

7    Q.    Okay.   The voice mail message that you testified about

8    being e-mailed to the FBI from the Capitol Police, was that

9    message preserved in its entirety?

10   A.    I don't know.

11   Q.    Who else heard it from the FBI besides you?

12   A.    Several agents.

13   Q.    Who?

14   A.    Agent McCoy, Agent Martin, TFO Lozano.

15   Q.    Did the FBI alter it in any way after they received it

16   from the Capitol Police?

17   A.    No.

18           MS. ROTH:   I don't have any further questions.

19           MS. GIESE:   Nothing further, Your Honor.

20           THE COURT:   You may step down.   Are there any

21       other witnesses from the government?

22           MS. GIESE:   No, Your Honor.

23           THE COURT:   Ms. Roth?

24           MS. ROTH:   Yes, Your Honor, we do have one

25       witness.   It is regarding the detention portion of this

```
 1        hearing.  Would you like to proceed with that or would
 2        you like to have a bifurcated hearing?
 3             THE COURT:  Do you have any objection to it?
 4             MS. GIESE:  No, Your Honor.
 5             DEPUTY CLERK:  Please raise your right hand.  Do
 6        you swear or affirm that the testimony which you may
 7        give in the case now before the court is the truth, the
 8        whole truth and nothing but the truth?
 9             THE WITNESS:  I do.
10                            EXAMINATION
11   BY MS. ROTH:
12   Q.   Good morning, ma'am.  Could you tell the Court your
13   full name please?
14   A.   My full name is Pamela Headley.
15   Q.   And where are you employed?
16   A.   Dillard's.
17   Q.   Are you working full-time there?
18   A.   Yes.
19   Q.   How do you know James Headley?
20   A.   He is my husband.
21   Q.   And how long have y'all been married?
22   A.   Twenty years next month.
23   Q.   How long have you known Mr. Headley?
24   A.   About 22 years.
25   Q.   Is he currently employed?
```

```
1    A.    No, ma'am.

2    Q.    Is he receiving any type of income?

3    A.    Disability.

4    Q.    And what is the disability for?

5    A.    It's from Social Security, it's from a stroke he had

6    three years ago.

7    Q.    Can you tell us a little bit about that stroke?

8    A.    I know he had a major stroke on the left side of his

9    body.  I come home from work and found him and called 911

10   and they took him to the Emergency Room.

11   Q.    How long was he in the hospital?

12   A.    Three months.

13   Q.    Since he came home, what has his role been in your

14   household?

15   A.    He kind of takes care of the house, he's kind of

16   housekeeper and I work, he's not able to work.

17   Q.    And what are the details of that, what does he do

18   around the house?

19   A.    Cleaning, house chores, outside chores, inside chores.

20   He does a little bit of everything, he helps me out.

21   Q.    Is he good at it or not good at it?

22   A.    Yes, ma'am.

23   Q.    Are you aware of his military history?

24   A.    Yes, ma'am.

25   Q.    Could you tell the Court what his military history is?
```

```
1    A.    I don't know too many details, but he was in the

2    military from like '80 to '86.

3    Q.    Okay.  Do you know what branch?

4    A.    No, ma'am.

5    Q.    Do you know about any accommodations he received?

6    A.    No, ma'am.

7    Q.    Do you know of any trauma he experienced while there?

8    A.    PTSD.

9    Q.    And how do you know that?

10   A.    Just kind of from past experience he had in the

11   military from -- I mean I wasn't with him then, so --

12   Q.    Right.  Are you aware that he has been seeing a doctor?

13   A.    Yes, ma'am.  He has a primary doctor.

14   Q.    Okay.  A primary care doctor?

15   A.    Yes, ma'am.

16   Q.    Is that primary care doctor giving him or not giving

17   him mental health treatment currently?

18   A.    No, ma'am.

19   Q.    Would you like to see that happen?

20   A.    Yes, ma'am.

21   Q.    In the Pretrial Services Report, it says that you are

22   willing to assist Mr. Headley by serving as his custodian.

23   Is that accurate?

24   A.    Yes, ma'am.

25   Q.    What is your wish for the Court as far as whether he be
```

1   ordered to return home or not?

2   A.   Yes, I would like him to come home.

3   Q.   And if you could tell the Court why you would like

4   that?

5   A.   He has never been any harm to me whatsoever, he has

6   never threatened me, he's been a good husband to me, so --

7   Q.   In your testifying about that, are you responding to

8   what you heard from the prior witness in this case?

9   A.   No.  I've been at home with him.  He has a little bit

10  of anger issues, but he's never taken it out on me, he's

11  never hurt me before.

12  Q.   Okay.  Are you afraid of him or not afraid of him?

13  A.   No.

14  Q.   If he were ordered to return home -- first of all, how

15  long have y'all lived there?

16  A.   Seventeen years.

17  Q.   Are you renting or buying that house?

18  A.   Buying.

19  Q.   If he were to return home and if the Court were to

20  order that firearms be removed from the house prior to him

21  returning home, what would you do?

22  A.   I would remove them.

23  Q.   Is there another property or place or family member who

24  could -- to whom you could give those?

25  A.   Yes.

```
1   Q.    Would you have any qualms about doing that?

2   A.    No, ma'am.

3   Q.    Do you understand that if you were ordered to be a

4   custodian, that would require you to advise the U.S.

5   Pretrial Services if your husband was not in compliance with

6   bond?

7   A.    I did not comprehend that.

8   Q.    I'm sorry --

9          THE COURT:  We might impose some rules about his

10         conduct and what he has to do and if you find out he's

11         not following those, you have to contact Pretrial and

12         let them know.  Are you okay with that?

13         THE WITNESS:  Yes.

14  BY MS. ROTH:

15  Q.    And you're willing to do that?

16  A.    Yes, ma'am.

17         MS. ROTH:  No further questions -- pass the

18         witness.

19                              EXAMINATION

20  BY MS. GIESE:

21  Q.    Ms. Headley, you said you worked at Dillard's?

22  A.    Yes, ma'am.

23  Q.    How long have you worked there?

24  A.    Seventeen years.

25  Q.    And that's your full-time job?
```

```
1    A.    Yes, ma'am.

2    Q.    What times do you work?

3    A.    I work shifts of either ten to seven or 12 to nine.

4    Q.    And to be sure, and correct me if I'm wrong please, but

5    Mr. Headley is currently unemployed and he receives

6    disability?

7    A.    Correct.

8    Q.    Is he at home most of the time?

9    A.    Yes, ma'am.

10   Q.    Now, is it incorrect to say that in 2008 you called

11   Universal Police?

12   A.    No, ma'am, I did not.

13   Q.    You did not call Universal Police?

14   A.    No, ma'am.

15   Q.    Do you remember that Universal City Police came out to

16   talk to you?

17   A.    No, ma'am.

18   Q.    So you deny that you ever called Universal City Police?

19   A.    Correct.

20   Q.    And you deny that Universal City Police was told in

21   2008 that he had a rifle?

22   A.    Correct.

23   Q.    And that he, Mr. Headley, took the rifle and sat

24   holding the rifle in your living room?

25   A.    Correct.
```

1   Q.   You deny that that ever happened?

2   A.   Correct.

3   Q.   Have you always lived at the 178 Oakside address in

4   Universal City?

5   A.   Correct.

6   Q.   So you deny that Universal Police -- Universal City

7   Police were ever called from that address and told that

8   Mr. Headley had possessed a rifle and this was after you had

9   an argument with him?

10  A.   Correct.

11  Q.   Did you own or did Mr. Headley own a rifle in 2008?

12  A.   He has a gun in the house, yes.

13  Q.   Is that a rifle or the handgun?

14  A.   Handgun.

15  Q.   Is that the only weapon in the house at this time?

16  A.   Yes.

17  Q.   And in 2008, did you or him own any other weapons?

18  A.   No, ma'am.

19  Q.   Would you agree with me that Mr. Headley has had some

20  anger outbursts?

21  A.   Yes, ma'am.

22  Q.   Do you know of any outbursts occurring while you have

23  been at work?

24  A.   No, ma'am.

25  Q.   Does anyone stay with Mr. Headley while you are at

1    work?

2    A.   No.

3             MS. GIESE:  Pass the witness, Your Honor.  Thank

4    you, ma'am.

5             MS. ROTH:  No further questions.

6             THE COURT:  Any other witnesses?

7             MS. ROTH:  No, Your Honor.

8             THE COURT:  You may be excused.  Are we going to

9    have -- I'll take notice of the Pretrial Services

10   Report.  Any objections?

11            MS. ROTH:  No objection.

12            MS. GIESE:  No objection.

13            THE COURT:  I'll reflect for the record there's

14   been one modification to it.  Pretrial notified me that

15   on page three where it indicated the defendant had used

16   cocaine three times in college, it was actually

17   marijuana.  And are there any other inaccuracies that

18   need to be brought to the Court's attention?

19            MS. ROTH:  The only thing else that Mr. Headley

20   said to me was that on page one it's the -- the correct

21   name is Riley Field Barracks Hospital instead of Riley

22   Air Force Base in Hamburg, Germany.

23            THE COURT:  Okay.  Court will take notice of the

24   Pretrial Services Report then.  At this time I -- well,

25   first of all, the first issue is whether or not there's

1    probable cause to support the charge that's been

2    brought against you and I find that the evidence

3    presented does establish probable cause that you

4    committed the offense you are herein charged with.

5            As to the detention hearing, I have two

6    things I have to decide, Mr. Headley.  One is are you a

7    risk of flight.  And the other is whether or not I can

8    impose conditions that can reasonably assure the safety

9    of the community.  Due to the threatening behavior

10   that's been alleged, I have some concerns about that.

11   I am not concerned about you being a risk of flight at

12   all.  I am open to the idea of your pretrial release

13   with conditions that you have a wife who is very

14   supportive of you, it would look like Pretrial

15   monitoring you and probably being under house arrest,

16   but I am not a mental health professional and I think

17   we need an evaluation of your mental health status

18   before I can release you.  So what I'm going to do at

19   the moment is I'm going to continue this hearing so

20   that the government can confer with your attorney to

21   see whether or not there can be an agreement reached

22   about how the mental health evaluation will proceed and

23   if there's not and I have to make some sort of ruling

24   about the appropriate way to handle that, I will.  So

25   any objection to proceeding in that way?

1    MS. GIESE:  Not at all, Your Honor.

2    MS. ROTH:  No, Your Honor, thank you.

3    THE COURT:  So we will be in recess.  The Court

4    will issue an order and set a new time unless you have

5    one already in this case.  How much time do you think

6    you would need to confer and regroup?

7    MS. ROTH:  We'll try our hardest.

8    THE COURT:  A week?

9    MS. ROTH:  Yes, and we'll try our hardest to bring

10   something to you before then.

11   THE COURT:  And obviously if you get something by

12   agreement, we'll remove the setting, but --

13   DEPUTY CLERK:  You can have July 26th at 9:30 in

14   the morning.

15   THE COURT:  That works.  So we'll be in recess

16   until then and the attorneys can work together to try

17   to come up with a plan to get the information needed

18   and I thank everyone for their presentations.  I thank

19   the witnesses for coming in today.  And you are

20   remanded to the custody of the Marshals for now while

21   we're in recess.  Thank you.

22   COURT SECURITY OFFICER:  All rise.

23   (10:35 a.m.)

24                    *    *    *

25

```
1                          *    *    *    *    *

2     UNITED STATES DISTRICT COURT

3     WESTERN DISTRICT OF TEXAS

4

5          I certify that the foregoing is a correct transcript

6     from the electronic sound recording of the proceedings in

7     the above-entitled matter.  I further certify that the

8     transcript fees and format comply with those prescribed by

9     the Court and the Judicial Conference of the United States.

10

11    Date signed:  August 21, 2017

12

13                                /s/ Angela M. Hailey
                                  _____
14                                Angela M. Hailey, CSR, CRR, RPR
                                  Official Court Reporter
15                                655 East Cesar E. Chavez Blvd.
                                  Third Floor
16                                San Antonio, Texas  78206
                                  (210)244-5048
17

18

19

20

21

22

23

24

25
```