```
 1                  UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3   UNITED STATES OF AMERICA,    )
                                  )
 4         Plaintiff,             )
                                  )
 5           vs.                  )    Docket No. SA-17-CR-608(1)-XR
                                  )
 6   JAMES AMOS HEADLEY,          )    San Antonio, Texas
                                  )    August 24, 2017
 7         Defendant.             )    10:27 a.m. to 11:24 a.m.
     _____)
 8                   TRANSCRIPT OF DETENTION HEARING
 9          BEFORE THE HONORABLE ELIZABETH S. CHESTNEY
                   UNITED STATES MAGISTRATE JUDGE
10
     FOR THE GOVERNMENT:
11        UNITED STATES ATTORNEY'S OFFICE
          By:  Bettina J. Richardson, Esquire
12        601 N.W. Loop 410, Suite 600
          San Antonio, TX  78216
13
     FOR THE DEFENDANT:
14        FEDERAL PUBLIC DEFENDER'S OFFICE
          By:  Molly L. Roth, Esquire
15        727 East Cesar E. Chavez Blvd., Room B-207
          San Antonio, TX  78206
16
     COURT RECORDER:  FTR Gold
17
     TRANSCRIBER:
18        CHRIS POAGE
          United States Court Reporter
19        655 East Cesar E. Chavez Blvd., Rm. 314
          San Antonio, TX  78206
20        Telephone:  (210) 244-5036
          chris_poage@txwd.uscourts.gov
21
     Proceedings reported by electronic sound recording.  Transcript
22   produced by computer-aided transcription.

23

24

25
```

1                              INDEX

2                                                          PAGE

3    RONDA CLARK

4    Direct Examination by Ms. Richardson .......................4

5    Cross-Examination by Ms. Roth ...........................11

6    LEE MCLOY

7    Direct Examination by Ms. Richardson .....................14

8    Cross-Examination by Ms. Roth ...........................19

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1        (Open court at 10:27 a.m.)

2             THE COURT:  You may be seated.

3             THE COURTROOM DEPUTY:  The Court calls the case of the

4    United States of America versus James Amos Headley.  This is

5    case number SA-17-CR-608.

6             MS. RICHARDSON:  Bettina Richardson on behalf of the

7    United States.  Good morning, Your Honor.

8             THE COURT:  Good morning.

9             MS. ROTH:  Molly Roth for Mr. Headley.  Good morning,

10   Your Honor.

11            THE COURT:  Good morning.

12     We are here on a continuation of the detention hearing

13   regarding the defendant, Mr. Headley.  I have received from the

14   psychologist a copy of the report, and I've reviewed it.  And

15   pretrial's been provided with a copy of it.

16     Ms. Richardson, have you had an opportunity to review it?

17            MS. RICHARDSON:  I have, Your Honor.

18            THE COURT:  And Ms. Roth?

19            MS. ROTH:  Yes, Your Honor.

20            THE COURT:  Okay.  So that information, in addition to

21   the testimony that was taken during the detention hearing, I've

22   considered all of that.  Is there more evidence that's going to

23   be presented today?

24            MS. RICHARDSON:  Yes, Your Honor.

25            THE COURT:  Okay.  You can call your first witness?
```

1              MS. RICHARDSON:  The government calls Special Agent

2    Ronda Clark.

3              THE COURTROOM DEPUTY:  Please raise your right hand.

4        (The oath was administered)

5              THE COURTROOM DEPUTY:  Thank you.

6              MS. RICHARDSON:  Your Honor, since I was not -- I did

7    not participate in the original beginning of the detention

8    hearing, I have ordered a copy of the transcript and am aware

9    of the information that was presented.  Special Agent Clark

10   testified as to the incident that occurred prior to and on the

11   day of the -- with regards to the day of the arrest.  And if

12   it's okay with the Court, I won't go back through all that.

13             THE COURT:  That's okay.  I was here for that

14   testimony, and I've also reviewed the transcript again for the

15   continuation of the hearing today.

16                RONDA CLARK, GOVERNMENT'S WITNESS, SWORN

17                          DIRECT EXAMINATION

18   BY MS. RICHARDSON:

19   Q.  Special Agent Clark, in addition to the information that

20   you provided for the Judge at the prior hearing, I believe that

21   was on July 19th, during that hearing was there some discussion

22   about a call for service to the residence of the defendant and

23   his wife, specifically on Oakside in Universal City?

24   A.  There was.

25   Q.  And that was with regards to an incident or a call for

1   service on September the 9th, 2008; is that correct?

2   A.  It was the walk-in.

3   Q.  On September 9th, 2008?

4   A.  Yes.

5          MS. RICHARDSON:  And, Your Honor, may I approach the

6   witness?

7          THE COURT:  Yes.

8      You said the "walk-in"?

9          THE WITNESS:  A walk-in complaint.

10          THE COURT:  Oh, okay.

11  BY MS. RICHARDSON:

12  Q.  And what is a walk-in complaint?

13  A.  It's when somebody goes to the police station.

14  Q.  And to file a complaint about something that has happened

15  in their -- in their life; a criminal complaint?

16  A.  Correct.

17  Q.  And so as a result of that, is that person interviewed and

18  documentation made?

19  A.  Yes.

20  Q.  And did -- were you asked to secure a copy of the

21  documentation related to that walk-in complaint?

22  A.  Yes.

23  Q.  And did you do that?

24  A.  Yes.

25          MS. RICHARDSON:  Your Honor, government has provided

1  Government's Exhibit 1 to defense counsel prior to the hearing.

2  And at this time I will offer into evidence Government's

3  Exhibit 1.

4  BY MS. RICHARDSON:

5  Q.  Did you have an opportunity to look over that walk-in

6  complaint?

7  A.  I did.

8  Q.  And would it be helpful if you have one to look at while

9  you testify?

10  A.  Yes.

11  Q.  And it is a multipage document; is that correct?

12  A.  Correct.

13  Q.  And specifically, let me turn your attention to the address

14  that is documented.  Is that the same address where the

15  defendant was arrested in July of 2017?

16  A.  Yes.

17  Q.  In Universal City?

18  A.  Yes.

19  Q.  And when -- based upon your investigation and the

20  information that you've received, how did the FBI become aware

21  of the existence of this walk-in complaint?

22  A.  The FBI was working with Universal City Police Department,

23  and they ran the address and were aware of a report that was

24  made.

25  Q.  On the day of the arrest?

1   A.   Correct.

2   Q.   So the FBI reached out to local law enforcement with

3   regards to their intention to make an arrest in their

4   jurisdiction?

5   A.   Correct.

6   Q.   And Universal City police are the ones who actually

7   informed FBI:  Hey, when you get to this house, you need to

8   know there's been an offense report filed about violence in

9   that house?

10  A.   Correct.

11  Q.   Okay.  And that's standard protocol for the safety of

12  everybody that's involved; is that right?

13  A.   Yes.

14  Q.   Okay.  If you'll look at the last page of the offense

15  report, specifically with regards to the information where it

16  says, "P. Headley is going to leave her husband due to the

17  constant verbal abuse.  She's rented an apartment and will move

18  out on October the 1st, 2008.  I advised her, if she's afraid

19  of her husband, a protective order could be filed and she could

20  be taken to a shelter."

21       Did you do any research, utilizing investigative methods,

22  to determine whether or not Ms. Headley had, in fact, done any

23  research or made any movement in the direction of moving out

24  and renting an apartment in October -- or September of 2008?

25  A.   I did.

```
 1   Q.   Okay.  And were you able to identify an apartment that she
 2   was planning to move to on October the 1st?
 3   A.   There is an apartment that comes up dated October 2008
 4   under her name.
 5   Q.   And what is that -- name of that apartment?
 6   A.   I believe it's Park Ridge Apartments.
 7   Q.   In Universal City?  Or in San Antonio?
 8   A.   San Antonio.
 9   Q.   On Randolph Road?
10   A.   Yes.
11   Q.   Okay.  And did she indicate whether or not she was going
12   to -- based on this offense report, whether or not she was
13   going to stay in the family home or leave the family home prior
14   to October 1st?
15   A.   In the report she indicates that she will stay with friends
16   until October.
17   Q.   Okay.  And you heard Ms. Headley testify at the prior
18   hearing?
19   A.   Yes.
20   Q.   And she actually denied having a conversation with law
21   enforcement with regards to abuse from her husband?
22   A.   Yes.
23        MS. ROTH:  Your Honor, this record speaks for itself.
24   We have a transcript of it.  I object to any testimony about
25   how the officer might view that transcript.  We can all read it
```

1  for ourselves.  And it is the best evidence on the point, not

2  the officer's speculation about anything.

3           THE COURT:  I've also read it, and I know what she

4  testified to.

5  BY MS. RICHARDSON:

6  Q.  Did you, as a result of reviewing this offense report,

7  specifically the paragraph where it says, P. Headley made a

8  similar report on April the 9th, 2000, and it lists an offense

9  report number?

10 A.  Yes.

11 Q.  As a result of that, did you go in pursuit of that offense

12 report?

13 A.  I did.

14 Q.  And that offense report is dated April the 9th, 2000; is

15 that correct?

16 A.  That's correct.

17          MS. RICHARDSON:  May I approach, Your Honor?

18 BY MS. RICHARDSON:

19 Q.  I'm going to show you what's been marked as Government's

20 Exhibit Number 2 and ask you if that's the offense report?

21 A.  That is.

22          MS. RICHARDSON:  Your Honor, at this time the

23 government has tendered a copy to defense counsel and would

24 offer this into evidence.

25          THE COURT:  Any objection, Ms. Roth?

1          MS. ROTH:  This is the first time I've seen this.  If

2    I could just read it for one moment, Your Honor.

3          THE COURT:  Sure.

4       (Pause)

5          MS. ROTH:  I don't have an objection to either one of

6    these for purposes of this hearing, Your Honor.  It doesn't

7    mean that I agree with everything that's in them.  This is the

8    first time I've seen the second report.  The first one I had

9    seen before but got a copy of this morning before the hearing.

10         THE COURT:  Okay.  Thank you, Ms. Roth.  This will be

11   admitted, as will Exhibit 1.

12      (Government's Exhibit Nos. 1 and 2 admitted)

13   BY MS. RICHARDSON:

14   Q.  Okay.  Looking at the second page, this again was a walk-in

15   complaint?

16   A.  Correct.

17   Q.  Where Ms. Headley drove herself to Universal City Police

18   Department to file an official report about something going on

19   in the family home --

20   A.  Correct.

21   Q.  -- involving the defendant.

22       And towards the end it says, "Ms. Headley stated that she

23   feels her husband is capable of causing her physical harm and

24   does fear for her safety if her husband finds out she reported

25   this to the police"; is that correct?

1    A.  Correct.

2    Q.  And the next paragraph says that she plans to come in on

3    April the 10th at 4:30 and talk to an investigator?

4    A.  Correct.

5    Q.  Do you have any information as to whether or not she

6    followed through on that plan?

7    A.  I do not.

8         MS. RICHARDSON:  Okay.  I pass the witness.

9         THE COURT:  Thank you, Ms. Richardson.

10        Ms. Roth.

11                        CROSS-EXAMINATION

12   BY MS. ROTH:

13   Q.  Agent Clark, your investigation doesn't reveal that

14   Mrs. Headley ever moved out of the house, correct?

15   A.  Correct.

16   Q.  The police reports that are given both describe walk-ins

17   and not phonecalls to the Universal City Police Department,

18   correct?

19   A.  That is correct.

20   Q.  They also confirm that Mrs. Headley was working at that

21   time at Dillard's?

22   A.  Yes.

23   Q.  They also note that Mrs. Headley said that she has never

24   been threatened by firearms and that there was no physical

25   violence alleged by her, correct?

1    A.   In one of the reports she felt that it implied a threat, in

2    the 2000 report.

3    Q.   That was what Ms. Richardson just read to you, correct?

4    A.   The report says she felt having the gun at his side implied

5    a threat to her.

6    Q.   Which is what Ms. Richardson just read to you, correct?

7    You just testified about that on direct?

8    A.   I don't remember her reading that specific statement but --

9    Q.   Okay.  Other than that statement, which is an implied

10   threat, is what you're saying -- let's go back to the question.

11   Other than that, there's no indication at all or allegation at

12   all that Mrs. Headley was ever threatened by a firearm,

13   correct?

14   A.   Can you describe what you're talking about with

15   threatening?  Because when somebody walks into a room, picks up

16   a firearm and comes back out, that can be construed as a

17   threat.

18             THE COURT:  Ms. Roth, let me see if I can ask the

19   question.

20       Other than the things that have been reported in these two

21   police reports, do you have any other information of

22   Mr. Headley making a threat with a firearm?

23             THE WITNESS:  No.

24             THE COURT:  Okay.

25

1    BY MS. ROTH:

2    Q.  And it's clear from these two police reports that

3    Mrs. Headley is telling the police, according to these police

4    reports, that she has not ever been physically threatened or

5    abused by Mr. Headley, correct?

6            THE COURT:  Ms. Roth, you know what?  I can read the

7    police reports.  And I've read them and I see what they say and

8    what she said and what the police officer said in them.  I

9    don't think Ms. Clark can offer me anything else beyond that

10   interpretation, that I can't do myself.  So you want to go on

11   and ask anything else.

12   BY MS. ROTH:

13   Q.  Okay.  You don't have any other -- any other information

14   about this other than what's in these two police reports,

15   correct?

16   A.  Not at this time.

17           MS. ROTH:  I don't have any further questions, Your

18   Honor.

19           THE COURT:  Thank you, Ms. Roth.

20           MS. RICHARDSON:  Nothing further from this witness.

21           THE COURT:  Okay.  You can step down.

22           MS. RICHARDSON:  The government calls Special Agent

23   Lee McCoy -- McLoy.

24           THE COURTROOM DEPUTY:  Raise your right hand.

25       (The oath was administered)

1        THE COURT:  Good morning.

2        THE WITNESS:  Good morning.

3             LEE MCLOY, GOVERNMENT'S WITNESS, SWORN

4                   DIRECT EXAMINATION

5    BY MS. RICHARDSON:

6    Q.  Special Agent McLoy, will you introduce yourself and spell

7    your last name for the benefit of the transcript?

8    A.  I'm Special Agent Lee McLoy.  And my last name is spelled

9    M-C-L-O-Y.

10   Q.  And you are a special agent with the Federal Bureau of

11   Investigations?

12   A.  Yes, ma'am, I am.

13   Q.  And how long have you been?

14   A.  For approximately 15 years.

15   Q.  And in that capacity do you investigate threats on public

16   officials?

17   A.  Yes.

18   Q.  And did you have an opportunity to participate in the

19   investigation that involves James Amos Headley?

20   A.  I was the original agent that took the call from D.C.

21   police.

22   Q.  Okay.  And as a result of that, were you also present on

23   July 13th, 2017, at the residence in Universal City when the

24   defendant was arrested?

25   A.  Yes.

1   Q.  And while you -- as a part of that, did you also transport

2   the defendant from Universal City from that location?

3   A.  I was not in the vehicle with him.  I followed behind.  But

4   I was familiar with the agents that did transport him.

5   Q.  And following that transport, were you provided some

6   information that he shared voluntarily during the transport?

7   A.  Yes, I was.

8   Q.  And what was that?

9   A.  I was informed by Task Force Officer Dave Lozano, who is

10  with San Antonio Police Department, that Mr. Headley had made

11  some comments about prior violence, events in his --

12          MS. ROTH:  Your Honor, I'm going to object at this

13  point because Mr. Lozano could certainly come in and testify if

14  the government wished to call him.  Hearsay is admissible at

15  these hearings, but this is too critical and too attenuated.

16  This witness testified that he didn't hear these statements;

17  that another officer reported them to him.  And so I'm going to

18  object as this hearsay being too attenuated.

19          THE COURT:  Okay.  That objection is overruled.  We're

20  in the context of a detention hearing, and I can have hearsay

21  testimony.  And I will give it the -- I will factor in its

22  attenuation into how much weight I give it.

23  BY MS. RICHARDSON:

24  Q.  Special Agent McLoy, what did Dave Lozano share with you

25  that the defendant said during transport that he felt was of

1    value to share with the lead agent at that time?

2    A.   So just for clarity, Officer Lozano both spoke with me and

3    provided me a copy of his report.  So I've read the report and

4    hearing him directly.  Officer Lozano shared that Mr. Headley,

5    in the back seat of the vehicle, had described an event when he

6    was in the military and transporting a prisoner, and that the

7    prisoner had a history of violence.  And at one point

8    Mr. Headley pistol-whipped the prisoner severely and -- but

9    that the weapon was unloaded.

10   Q.   And Task Force Officer Lozano, did he give you an

11   indication of how the defendant was during the relay of that

12   information, what his demeanor was?

13   A.   Officer Lozano I think shared that it was almost

14   braggadocious to -- that the way that the story was relayed

15   from Mr. Headley.

16   Q.   Okay.  And during -- were you present and a part, the lead

17   agent, of the interview of the defendant once he was in a place

18   to be interviewed?

19   A.   Yes.

20   Q.   And was that interview after having provided him with his

21   constitutional and statutory warnings?

22   A.   Yes, that was.

23   Q.   And he voluntarily participated in the interview?

24   A.   Yes, he did.

25   Q.   Were there things that he said during that interview that I

1    believe you later described to me as chilling?

2    A.   Yes.

3    Q.   And what were those?

4    A.   Well, there were several comments that were made, that

5    hearing them a first time was chilling.  And then I went back

6    and reviewed the video and audio that was made of the -- of the

7    interview for my report.  And some of the comments that came to

8    mind, that I also documented in the 302, was Mr. Headley

9    describing the event that took place in northern Virginia with

10   the shooting of the congressman on the baseball field.

11        What was chilling about his retelling of the story was that

12   -- not so much that he was concerned for the well-being of the

13   congressman, but that he felt the subject of that event that

14   was shooting at the congressman didn't know what he was doing

15   with the rifle.  And had the subject known what he was doing

16   with the rifle, that the devastation could have been much more

17   severe.  That was one event.  There were several other events

18   as well.

19   Q.   What other event comes to mind -- statement that he made

20   during that interview?

21   A.   There was a statement that he made about -- I think Ted

22   Cruz was doing a town hall event.  And in that event Senator

23   Cruz was approached, and there was an exchange between Senator

24   Cruz and a citizen taking part in the town hall event, and --

25   Q.   And did Mr. Headley give you any indication that if he had

```
 1   been present at that town hall --
 2          MS. ROTH:  Judge, the witness needs to testify, Your
 3   Honor.  And I object to counsel -- she's done this, and that's
 4   fine.  It's expediting the hearing.  But this is too much.
 5   This is on a point that if the witness can remember, he can
 6   remember.  If he can't, he can't.  But no testimony from the
 7   counsel.
 8          THE WITNESS:  I recall the statement.
 9          MS. RICHARDSON:  Okay.
10          THE WITNESS:  So the statement was that Mr. Headley
11   took offense to the way the senator was responding to the
12   individual; and that if Mr. Headley had been that individual,
13   he would have beat the senator and --
14          THE COURT:  "Would have" what now?
15          THE WITNESS:  Beat him with --
16          THE COURT:  Oh, beat him.
17          THE WITNESS:  Beaten him.  And that the next time that
18   they had an exchange, that he would know not to talk to him
19   that way.  And that's a paraphrase, but that was what he said.
20   BY MS. RICHARDSON:
21   Q.  Did the defendant admit to you during the interview that he
22   was the one who placed the phonecalls to Senator Cruz' office?
23   A.  Yes.  Mr. Headley took responsibility for the call.
24   Q.  Did he try to mitigate it or give any impression that,
25   well, he didn't really mean it?
```

1    A.  No, he did not.

2    Q.  Did he offer explanations about actually why he did mean

3    it?

4    A.  He did.

5    Q.  Did he give you explanations about what had actually made

6    him angry?

7    A.  Yes, he did.

8    Q.  Was there a point during the conversation -- do you recall

9    whether or not he indicated to you that he recognizes that an

10   individual of his size can actually really hurt someone if he

11   wants to?

12   A.  He said that, and I documented it in my report.

13   Q.  Did he tell you that there were instances in his life in

14   the past when he got really hot and really worked up?

15   A.  Yes.

16   Q.  And did he indicate whether or not he was really hot and

17   really worked up with Senator Cruz?

18   A.  He said specifically that he was really hot, and I notated

19   that in my report as a direct quote.

20          MS. RICHARDSON:  I pass the witness.

21          THE COURT:  Thank you.

22       Ms. Roth.

23                     CROSS-EXAMINATION

24   BY MS. ROTH:

25   Q.  Pursuant to current FBI policy, the entire statement that

```
 1   you took from Mr. Headley is video and audio recorded?
 2   A.  Yes.  That's correct.  And I believe that was provided as a
 3   part of discovery.
 4           MS. RICHARDSON:  It will be.
 5           MS. ROTH:  Okay.  Yeah.  There had been no
 6   discovery --
 7           THE WITNESS:  I'm not the case agent.  I just believe
 8   that that took place.
 9           MS. ROTH:  Okay.  Well, there has been nothing
10   tendered so far.
11   BY MS. ROTH:
12   Q.  Where did you interview Mr. Headley?
13   A.  At the FBI office in San Antonio.
14   Q.  On the first floor?
15   A.  In the FBI office in San Antonio.
16   Q.  On the first floor?
17   A.  In the FBI office.
18           MS. ROTH:  Your Honor, I am allowed to ask what the
19   circumstances of the questioning were.
20           THE COURT:  Do you remember what floor?
21           THE WITNESS:  It was a processing room within the FBI
22   office.
23           THE COURT:  Okay.
24           THE WITNESS:  I would rather not give the format or
25   layout of the FBI office.
```

1        THE COURT:  Is there a reason you need to know the

2  format or layout of the FBI office?

3        MS. ROTH:  There are -- we have been told that there

4  are some rooms on the first floor where there is recording.

5        THE COURT:  Oh, okay.

6        MS. ROTH:  So I'm --

7        THE WITNESS:  I just -- I just testified that it was

8  recorded by audio and video.

9  BY MS. ROTH:

10 Q.  And there was no statement that Mr. Headley ever made to

11 any FBI agent that was not recorded by audio or video, correct?

12 A.  That's not true.  He made statements when he was being

13 transported, as was previously stated.

14 Q.  Oh, yes.  And you had mentioned that was to a Task Force

15 Officer --

16 A.  And that was not recorded by audio --

17 Q.  -- not an FBI agent?

18 A.  The Task Force Officer is assigned to the FBI, and he

19 represents the FBI, particularly out on this arrest.  But

20 anything he does with the FBI is on behalf of the FBI.

21 Q.  Any statement other than to Mr. Dave Lozano, the task force

22 officer, that was not recorded?

23 A.  Maybe the better way to answer that question is, what I can

24 tell you was recorded by audio and video was the custodial

25 interview of your client, Mr. Headley.

1   Q.  What other statements were made by him that weren't

2   recorded?

3          MS. RICHARDSON:  Your Honor, I object.  He's not going

4   to know if there were statements made to other individuals that

5   weren't recorded.

6          THE COURT:  So the middle ground between these two

7   questions is, do you know of any other statement other than

8   those made to the task force officer and ones that were made in

9   the report of custodial interview that Mr. Headley made?

10         THE WITNESS:  Sure.  Mr. Headley made a comment to me

11  when I asked him his identity out in -- on the front porch of

12  his residence, just prior to being arrested.  So that was not

13  recorded by audio and video.

14  BY MS. ROTH:

15  Q.  Did he tell you who he was?

16  A.  I asked him who he was, and he responded:  James Headley.

17  Q.  Anything else?

18  A.  So that was not audio or video.

19     And I think there was some general conversation that he

20  had.  Actually, I do believe that was recorded on audio and

21  video, where he talked about his high school and collegiate

22  sports, sporting events.  I think he also may have mentioned

23  that -- I believe it was in the 302 from Officer Lozano, that

24  he made those similar type of comments in the -- in the

25  vehicle.

1   Q.  Okay.  So the conversations in the vehicle were also

2   recorded by audio and video?

3   A.  Ms. Roth, I said the only recording that took place before

4   audio and video was the custodial interview of Mr. Headley.

5   Q.  Okay.  Well, then you said that there was also recorded

6   audio and video about high school events that were --

7   A.  No.  I said that he made --

8   Q.  -- and he talked about that in the car?

9   A.  No.  I said he made comments -- I'm sorry.  For --

10          THE COURT:  He was answering my question.  My question

11  was, what statements does he know of that Mr. Headley made

12  other than the ones made in his custodial interview in the FBI

13  office or in the -- or in the car?  You're answering all the

14  statements you're aware of.

15          THE WITNESS:  I think the question was the same.  And

16  I think Ms. Roth had asked me what other statements were made

17  that were outside of an audio and video?

18          THE COURT:  Okay.

19          THE WITNESS:  And I think I was just answering to

20  that.

21          MS. ROTH:  Okay.

22          THE WITNESS:  So the statements about sporting events

23  were also made in the vehicle, on the transport.

24  BY MS. ROTH:

25  Q.  And that's what I had understood.  So I think maybe what

1   you mean is that he had talked about those on the recording in

2   the part of the custodial interview, but you think that also

3   those were discussed in the -- in the vehicle, which was not

4   recorded.  Is that correct?

5   A.  Yes.  That's correct.

6   Q.  Okay.  Now I understand.

7       Anything else?  Any other statements?

8   A.  Nothing specific that I can recall.

9   Q.  Mr. Dave Lozano transported him.  And anybody else doing

10  the transporting?

11  A.  There was one other officer.  And I believe that was an

12  SAPD officer as well.  While I was -- there were two transports

13  that took place, one from the site of the arrest, and a second

14  transport from the FBI office here in San Antonio to the

15  correctional facility or the jail.

16  Q.  Okay.  And did both of those officers handle both transport

17  legs?

18  A.  I believe that Officer Lozano participated in both.  And I

19  think on the second transport was Special Agent Clark, here in

20  the courtroom.  And I believe accompanying Officer Lozano from

21  the site of the arrest to the FBI office was Officer Cruz -- or

22  not -- Cruz, and I can't remember his last name.  He's with

23  SAPD as well, I believe.

24          MS. ROTH:  Okay.  Your Honor, at this point, based on

25  the testimony, I would move under Rule 26.2 for Dave Lozano's

1    report.  This witness said that he read it in preparation for

2    the testimony today, and then testified about what it -- what

3    was contained in there.

4           THE COURT:  Do you have a copy of the report,

5    Ms. Richardson?

6           MS. RICHARDSON:  Yes, ma'am.  The government's

7    tendering an FBI 302.  It's four pages, but the last -- Page 3

8    of 4 and 4 of 4 are blank, authored by Task Force Officer David

9    A. Lozano, with regards to the transport.

10          THE COURT:  Ms. Roth, do you need a brief recess for

11   you to review it?

12          MS. ROTH:  Maybe two minutes, Your Honor.  I mean, I

13   think I can review it quickly.  That would --

14          THE COURT:  I'm happy -- would it just be [inaudible]

15   to take two minutes to do it, and we'll just break?

16          MS. ROTH:  Thank you.

17          THE COURT:  You may step down.

18          THE WITNESS:  Thank you, Your Honor.

19      (Recess at at 10:56 a.m. until 11:00 a.m.)

20          THE COURT:  You may be seated.

21      [Inaudible] Ms. Roth.

22          MS. ROTH:  Thank you, Your Honor, very much.

23          THE COURT:  Sure.

24   BY MS. ROTH:

25   Q.  Agent, do you need to review this -- a copy of this report

1   from Mr. Lozano?

2   A.   I don't believe so.

3   Q.   Okay.  I just was going to ask you a few questions about it

4   since you already read it and reviewed it.

5   A.   Sure.

6   Q.   Mr. Headley was not advised of his rights pursuant to

7   Miranda prior to what he said in the vehicle, correct?

8   A.   So FBI policy is, prior to asking a subject that's under

9   arrest any questions, that's when he is advised of his rights.

10  And that was done just prior to that custodial interview.

11  Q.   At the FBI, correct?

12  A.   At the FBI office, correct.

13  Q.   Yes.

14       And, again, I'm going now off of Officer Lozano's report.

15  A.   Yes.

16  Q.   So I'm just asking -- the Court has not seen this report.

17  So I'm asking you questions on it since you've testified about

18  it.

19  A.   Sure.

20  Q.   And according to that report, Mr. Headley was not advised

21  of his rights prior to being transported?

22  A.   He was advised that he -- all questions would be asked at

23  the FBI; and that once arriving at the FBI, that his rights

24  would be read to him --

25  Q.   Okay.

1    A.  -- I believe is -- the report says.  And he was not asked

2    any questions during transport.

3    Q.  And that's why no rights were given, I presume -- would be

4    in accordance with FBI policy?

5    A.  FBI policy is once the custodial interview starts, that's

6    when the advice of rights is given.

7    Q.  Mr. Headley spoke about, you testified, his athletic

8    accomplishments but, also, his service in the military and the

9    service in the military of other family members, correct?

10   A.  He did.

11   Q.  And also the fact that he had been working at the

12   Convention Center right up until a stroke disabled him from

13   working?

14   A.  Yes, he did.

15   Q.  And then he also thanked Special Agent Clark, who's in the

16   courtroom today, and Officer Lozano for being professional and

17   polite during the time they transported him from the FBI to the

18   correctional facility, correct?

19   A.  Yes.

20        MS. ROTH:  Your Honor, may I just have one moment to

21   look at my notes?  I don't think I have further questions, but

22   I just want to make sure.

23       (Pause)

24   BY MS. ROTH:

25   Q.  The custodial warnings that you testified about on direct

McLoy - Cross                                                    28

1    examination, those were in writing or orally?

2    A.  Both orally and in writing.  We read it to Mr. Headley.

3    Mr. Headley initialed by every right that was read to him,

4    indicating that he understood that right, and then he signed

5    it.  And then both myself and another special agent also

6    witnessed and signed it.

7              MS. ROTH:  No further questions.

8              THE COURT:  Thank you.

9          Anything else, Ms. Richardson?

10             MS. RICHARDSON:  Nothing further, Your Honor.

11             THE COURT:  You may step down.

12             THE WITNESS:  Thank you, Your Honor.

13             THE COURT:  Any more witnesses?

14             MS. RICHARDSON:  No, Your Honor.  The government,

15   recognizing that the Court has the information from the earlier

16   testimony on the 19th as well as the pretrial services report

17   and the information held therein, coupled with the testimony

18   and the exhibits from today, and the information from the

19   psychological evaluation -- and with all of that taken into

20   consideration, the government rests on detention.

21             THE COURT:  Okay.  Ms. Roth, do you have any

22   additional witnesses related to detention?

23             MS. ROTH:  No, Your Honor.  I presume that this will

24   be part -- the psychological report will be part of the record

25   of this, placed under seal perhaps?

1        THE COURT:  Yes.  I mean, it needs to be placed under

2   seal.  But it can be -- it will be part of the record.

3        MS. ROTH:  Thank you, Your Honor.

4        THE COURT:  So I will take government's -- you can

5   have the floor first for arguments on detention.

6        MS. RICHARDSON:  Your Honor, with regards to

7   detention, the government stands by their motion to detain this

8   defendant, not necessarily under risk of flight, but under the

9   ability to protect the community, both the specific victims in

10  this case as well as the community at-large.

11      The information that has been gleaned and put before the

12  Court involves multiple layers that show the dangerousness of

13  this defendant not only to Senator Ted Cruz but potentially

14  John McCain, as well as other public officials that he has

15  indicated he's been enraged with and reached out to.  I believe

16  he indicated to Special Agent McLoy that he also called Bernie

17  Sanders' office as well.

18      I know there's been discussion about some of his outbursts

19  being related to the stroke that was in 2014.  But clearly, the

20  2008 and the 2000 incident that were reported by his wife were

21  before the stroke.  Additionally, the information that's

22  contained within the psychological evaluation shows the

23  defendant's propensity to handling anything that upsets him or

24  causes him any kind of anxiousness or disgruntledness.  He

25  handles it with violence.

1    He indicated, on his own, during his psychological

2   evaluation, that he had physical altercations with peers when

3   he was a teenager.  And he could actually pinpoint that that

4   was because he felt like that they antagonized him.  And he

5   says:  I engaged in physical -- or he engaged in physical

6   fights wherein he never lost, and was subsequently accepted

7   into the community.  In his mind violence is the answer.  And

8   that has started from a very early age and has been ongoing.

9    He indicated that he was aggressive when involved in

10   collegiate-level football, although that would dissipate after

11   he left the field.  So, there again, when confronted in a

12   situation where he feels -- where that instance of fight or

13   flight steps in, he fights.  And if anything comes up that he's

14   unhappy about, that's how he handles it.

15    It's also not unimportant that the defendant's wife is an

16   enabler to the degree that she was not forthcoming with regards

17   to the incidents in 2000 and 2008.  He actually pointed out

18   during the psychological evaluation that his anger directed

19   towards Senator Ted Cruz caused him to feel threatened and

20   deceived, and that he not only made the phonecall and made

21   those threatening statements -- when given an opportunity to

22   say, I did not mean it, instead, he offered examples of, if he

23   ever had the opportunity or if something -- if he was

24   confronted, he would make sure that he did physical harm to Ted

25   Cruz in such a way that Ted Cruz would remember him the next

1   time he saw him.

2       The safety of our officials is at stake, but the safety of

3   everybody surrounding those officials is also at stake.  But in

4   addition to their physical safety, their ability to freely move

5   about the country, including the state of Texas, where they

6   serve, is also at stake, their ability to be at -- to know that

7   they are being protected.

8       And for those reasons the government would reassert their

9   motion to detain the defendant without bond.

10          THE COURT:  Ms. Roth.

11          MS. ROTH:  Thank you, Your Honor.  I would like to

12  start with Mr. Headley's -- the comments that Ms. Richardson

13  made regarding Mr. Headley's wife's testimony.  And you have

14  read the testimony here.

15          THE COURT:  And I was also here when she testified.

16          MS. ROTH:  Yes, Your Honor.

17      And I'm very pleased that Ms. Richardson did not say that

18  Ms. Headley was being untruthful.  I don't believe that that's

19  what we have reflected here.  And we don't know enough right

20  now about his relationship to know whether Ms. Richardson is

21  correct in characterizing the situation as an enabling one.

22      But I do just want to give you context, Your Honor.

23  Mrs. Headley testified after hearing the agent's testimony, and

24  being very bothered by the idea that there was an allegation

25  that her husband had threatened with firearms, because she

1   didn't believe that was accurate.

2       And so I think you need to have that in mind, and also in

3   mind that there was no preparation for that testimony

4   whatsoever.  The comments that she made, for instance, "You did

5   not call the Universal police?"  "No, ma'am."  Well, she

6   didn't.  She didn't make any call.  She -- according to the

7   police reports, they were walk-in.  That sounds very technical,

8   and maybe that is.  But I just would like Your Honor to

9   consider that in context.

10          THE COURT:  That one, I agree.  There's plausible

11   deniability.  But then:  And you deny that Universal City

12   police was told in 2008 that he had a rifle, correct?  And that

13   he, Mr. Headley, took the rifle and sat holding the rifle in

14   your living room, correct?

15      So those are in direct contradiction of what's in the

16   police report.

17          MS. ROTH:  Yes, Your Honor.

18          THE COURT:  I do have -- you know, as you can imagine,

19   that testimony today, the evidence presented today gives me

20   great pause in relying on the representations of Ms. Headley

21   and, you know, especially since she is the one being put forth

22   as a potential third-party custodian.  And I point blank asked

23   whether she would have comfort in being the person who would

24   have to report any violation or deviation from court orders,

25   instructions that would be her obligation to this Court -- you

1   know, that -- my faith and ability to trust that is being

2   comprised as well.  And so I'm being candid with you, if you

3   want to address that, but --

4            MS. ROTH:  I understand that, Your Honor.  And I

5   understand that.  I do believe that there are -- I do not

6   believe that the record as it stands shows Mrs. Headley to be

7   an untruthful person.  And I think that's important.

8       Ms. Richardson has characterized it as an enabler part of a

9   relationship so -- and I don't --

10           THE COURT:  It is not my [inaudible] to sit in

11  judgment of Ms. Headley, and I don't have any desire to do so.

12  It's just to take evidence I have in front of me and address

13  the issues under the Bail Reform Act in terms of whether there

14  are conditions that can mitigate the safety concerns that I

15  have.  And I'll just say that the evidence today has affected

16  that analysis.

17           MS. ROTH:  Yes, Your Honor.  And I understand that.  I

18  do think it's notable -- there are a couple of things that are

19  notable.  One is that -- consistency is that Mrs. Headley both

20  in the reports, that were apparently contemporaneously made in

21  2008 and the other year, said that there was no physical

22  violence whatsoever and that there was nothing like having a

23  gun pointed at her, being beaten by a gun, any contact with a

24  gun, no gun -- no gun violence and no physical violence.  And

25  that's clear from the record.  So I think those consistencies

1   are important.  And I think we're all in agreement that

2   there's -- that risk of flight is not an issue here.  So the

3   question is dangerousness and whether there are conditions

4   there.

5       At this juncture what I am requesting is that Mr. Headley

6   be released on bond to either a halfway house or a VA inpatient

7   program where he can receive the type of counseling that the

8   psychologist recommends.  And I think it's very important that

9   the psychologist's tests are consistent with him not being a

10  physical danger.  She specifically states that.  He doesn't

11  present being a physical danger to himself or to other people

12  or does not present any danger of property damage.

13      So I -- you know, her summary is clear that he does not

14  present this type of danger about which we have no evidence but

15  which the government is alluding to.  So I think that's -- that

16  is very important.

17      The other thing that's important is that she says he

18  needs -- he needs individual counseling.  He needs mood

19  regulation, and he needs anger management.  And these problems

20  stem from a physical impairment.  Now, his wife testified at

21  the other hearing that she believes he also suffers from

22  posttraumatic stress syndrome.  And that may very well be, and

23  that would predate the stroke.

24      But whether there existed anything prior to the stroke or

25  not, it's clear from this record that these problems either

1    stem from or worsened because of the 2014 stroke, and that

2    that's not the end of the story; that there is something that

3    can be done about that, and that that something to be done is

4    for Mr. Headley to undergo counseling, strict counseling.  He

5    can't get that in custody.  And we're asking that he be allowed

6    to live or required to live either in a halfway house or in a

7    VA inpatient program so that he can receive that counseling.

8              THE COURT:  Thank you.

9         Anything else?

10             MS. RICHARDSON:  Yes, Your Honor.  One of the things

11   that -- I want to be very clear about the government's position

12   with regards to Ms. Headley's testimony.  The reason I did not

13   comment on it is because she's not the defendant in this case.

14   The reason I did not call her to testify is because she would

15   have had to be appointed a lawyer.

16        So I characterized it as being an enabler.  But one of the

17   characteristics of enablers in the domestic violence cycle is

18   that they are untruthful and that they cover up for the

19   behavior of the abuser.

20        It also has a direct impact, as the Court has noted, on

21   their ability to be the one to call up when the abuser is not

22   abiding by terms and conditions of anything, whether it's

23   probation, pretrial release, supervised --

24             THE COURT:  [Inaudible] now requesting that he be

25   released to Ms. Headley's custody, and she's instead requesting

1    either release to a halfway house or to VA services.

2         MS. RICHARDSON:  And then we place the supervisors and

3    the caretakers at both of those facilities at the same risk.

4    Once they cross James Headley on his response, it is not

5    flight, but fight.  And we put them at risk.  And for that

6    reason he has -- as he pointed out himself, throughout his

7    life, when confronted with situations that caused him to feel

8    dishonored, mistreated, deceived, angered, he has responded

9    both verbally, but he has also responded violently.

10        This is not an instance of where someone has only been

11   verbal, which is also a crime.  This is an instance where the

12   person who has been verbal has also followed through on those

13   verbal attacks.

14        MS. ROTH:  On that point Ms. Richardson and I

15   profoundly disagree with respect to what the record shows.  And

16   I think it is important to note that even according to the

17   statements in the evaluation here, that violence is not

18   something Mr. Headley has resorted to; that the -- that

19   post-stroke his responses have been different than pre-stroke.

20   Pre-stroke he says he was aggressive towards his opponents in

21   collegiate-level football.  And I don't know how you can play

22   football without that.

23        THE COURT:  Yes.  I'm discounting the football

24   evidence.  I think that she's talking more about the statement

25   that he made that he pistol-whipped somebody, and other -- and

1   also -- so that one involves an actual use of violence as

2   opposed to just a threat of it.

3          MS. ROTH:  Yeah.  And it's interesting that that is

4   not in this report where he freely spoke with and was

5   questioned at length for at least -- at least four hours on one

6   day and at least four hours on the other day by the

7   psychologist.  So he does dispute the pistol-whipping.  The

8   agent -- I viewed the report.  The agent testified to what that

9   report said.  So I understand that.

10          Then the other thing that's in here is physical

11   altercations with peers while living in south Texas as a

12   teenager.  And the way they're described by him here, it's

13   defensive.  It's self-defense which, unfortunately, is

14   sometimes part of a high school experience.  In any respect,

15   there's nothing else in here regarding violence.  And the

16   doctor who evaluated him with tests and her analysis says that

17   she does not believe he's a risk for violence.  So, therefore,

18   I don't believe that any caretaker would be at risk of

19   violence.

20          I do have a copy of Mr. Headley's DE-214.  I'm happy to

21   tender that under seal as part of this record, too.  But I

22   don't think there's any dispute about the fact that he was

23   honorably discharged from the armed services and had -- there

24   was no incidence of violence during the entire time he was in

25   the U.S. military.

1    So I don't believe -- Ms. Richardson and I disagree on any

2    threat of violence.  And I stand by what the doctor says, which

3    is that he doesn't pose one.

4         MS. RICHARDSON:  Actually, not to keep beating this

5    dead horse, but the doctor says "high propensity," that he does

6    not pose a "high propensity."

7         THE COURT:  And I will just go on record as having

8    read the doctor's report and note that the doctor did not

9    have -- she mentioned the incident from the Universal City

10   walk-in report, the one incident.  She was not aware of the

11   other report.  It does not appear that she interviewed

12   Ms. Headley or got her account or questioned her about any

13   other incidents related to that.

14   So as far as the position she was in, it was much more

15   similar to my position during the first hearing when all we had

16   was a secondhand statement about a potential police report, not

17   the report itself, not any more information about it and not

18   evidence of a second report.

19   So I don't think that the doctor was acting with all of the

20   information that is now in front of the Court, is part of what

21   I am going to conclude.

22   Does anyone else have anything else to say?

23        MS. RICHARDSON:  Nothing further from the government.

24        MS. ROTH:  No, Your Honor.

25        THE COURT:  Okay.  I am ready to rule then on the

1    issue of detention.

2         This is a very difficult case because, as we know from the

3    current situation that exists -- and various situations have

4    been covered in the news and everything lately, knowing when

5    somebody is just angry and threatening to do very dangerous

6    things and knowing when they are going to be triggered to take

7    that next step and actually do it -- prognosticating about that

8    is a pretty tough thing to do.

9         But my task today is very limited.  I am tasked under the

10   Bail Reform Act with deciding whether or not there are

11   conditions I can fashion that ensure you won't be a risk of

12   flight or that ensure you won't be a risk of danger to the

13   community.  You are not a risk of flight.  I'm not concerned

14   about that at all.

15        The dangerousness to the community, this was a very close

16   call.  Coming into this hearing today, I had some reassurance

17   from -- what I'm not as concerned about is that I couldn't

18   impose conditions that would keep our public officials safe.  I

19   could put you under house arrest.  I can take all the guns out

20   of your house.  We could have pretrial monitor you.  We could

21   do all of those things.  And I feel confident we could monitor

22   your phone usage and we could make sure you're not threatening

23   anyone.  Those are all conditions I could do.

24        But my concern, and partially why I requested the

25   evaluation and a continuation of this hearing, was to make sure

1    that there wasn't going to be a danger posed to other members

2    in the community.  And based on the volatility and the evidence

3    that's been presented today, I'm not convinced that your wife

4    will be safe; that you won't act in a way that might endanger

5    yourself; that you won't act in a way that might endanger

6    pretrial services officers or other people who have to come

7    into contact with you in the course of your supervision.

8        I do not think there are conditions I can impose that would

9    ensure that safety.  And, therefore, for that reason I am going

10   to order your continued detention.

11       You are remanded to the custody of the marshals.  I will

12   follow with a written order that confirms this and any other

13   reason for detention.  We're in recess.

14   * * *

15       (Hearing adjourned at 11:24 a.m.)

16

17

18

19

20

21

22

23

24

25

1                          -oOo-

2       I certify that the foregoing is a correct transcript from

3  the electronic sound recording of the proceedings in the

4  above-entitled matter.

5       I further certify that the transcript fees and format

6  comply with those prescribed by the Court and the Judicial

7  Conference of the United States.

8

9  Date:  10/18/2017        /s/ Chris Poage
                            United States Court Reporter
10                           655 E. Cesar E. Chavez Blvd., Rm. 314
                            San Antonio, TX  78206
11                           Telephone:  (210) 244-5036

12

13

14

15

16

17

18

19

20

21

22

23

24

25